**UNITED STATES of America**

v.

**Jamil HAMDAN, also known as "Jimmy," and Omar Adel Mohamed, Defendants.**

**No. 95 Cr. 228(JG).**

United States District Court, E.D. New York.

June 16, 1995.

Zachary W. Carter, U.S. Atty., E.D.N.Y. by Samuel W. Buell, Asst. U.S. Atty., Brooklyn, NY, for the U.S.

James T. Moriarty, New York City, for Jamil Hamdan.

Gerald J. Di Chiara, New York City, for Omar Adel Mohamed.

## MEMORANDUM AND ORDER

GLEESON, District Judge:

The defendants, Jamil "Jimmy" Hamdan and Omar Adel Mohamed, are charged with receiving and possessing goods known to be stolen, and with conspiring to commit that offense. They have moved to suppress certain evidence that the government intends to offer at trial.

In January of 1995, the Federal Bureau of Investigation ("FBI") was notified by J.B. Hunt, a company involved in interstate transportation, that a 50–foot J.B. Hunt trailer loaded with Magnavox color televisions, stereo systems, portable cassette players and computer components had been stolen in East Brunswick, New Jersey. On January 13, 1995, the trailer was recovered in Staten Island, New York; the only items remaining in it were the computer components.

Approximately one month later, in mid-February of 1995, a confidential informant, who operated a small trucking business, tele-

phoned J.B. Hunt with information about a load of Magnavox electronics that the informant had been asked to transport. Security officials from J.B. Hunt put the informant in contact with the FBI.

On February 13, 1995, the informant telephoned the FBI and stated that he had been approached by an individual who asked the informant to transport Magnavox equipment. The informant told the FBI that he had been shown the Magnavox products, as well as paperwork that bore the name "J.B. Hunt." Additionally, the informant stated to the FBI that the individual seeking to move the electronics had imposed a series of conditions: he had told the informant that he and another man, both of Arab descent, wanted to be given the keys to the informant's truck; that they, rather than the informant, would drive the truck to a warehouse at an undisclosed location and load it with the merchandise; that the loaded truck would then be returned to the informant; and that the informant would finally drive the truck to two locations, which would be revealed to the informant only at the time he received the fully-loaded vehicle.

The FBI advised the informant to go through with the plan, which was scheduled for the next day, and told him that agents would conduct surveillance of the events as they transpired. On February 14, 1995, the agents observed the informant arrive at the prearranged meeting point in Brooklyn. Soon thereafter, the two defendants arrived at the meeting point. After the parties drove a short distance and pulled over on a nearby street, the defendants took the keys to the informant's truck. The defendants then drove the truck to a warehouse at 505 Johnson Avenue in Brooklyn and backed the vehicle into the warehouse's loading dock. The FBI continued to keep the vehicle under surveillance, but the truck completely blocked the agents' view of the loading dock and what was occurring there.

Approximately one hour after their arrival at the loading dock, the defendants reentered the truck and began driving away. The agents stopped the truck six blocks from the warehouse, arrested the defendants, opened the side door of the truck and discovered more than 100 boxes of Magnavox products. Some of these boxes matched the description of those stolen from J.B. Hunt.[1] The agents then returned to the warehouse at 505 Johnson Avenue and searched it, uncovering another 400 boxes of electronics that matched the description of the stolen Hunt load.[2]

In the first of the pre-trial motions that are the subject of this order, both Hamdan and Mohamed have moved to suppress the evidence discovered in the truck. The defendants assert that there was no probable cause for their warrantless arrest and the warrantless search of the truck. Second, Hamdan seeks to suppress the evidence obtained in the warrantless search of the warehouse.

On June 1 and June 7, 1995, this Court conducted a suppression hearing, and oral argument was heard on June 14, 1995. For the reasons set forth below, the defendants' motions are denied.

## A. THE MOTION TO SUPPRESS EVIDENCE SEIZED FROM THE TRUCK

### 1. Probable Cause for the Arrests

■■■ Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989); *see also Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979). In order to establish probable cause, there need not be a "prima facie showing of criminal activity." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). Probable cause is instead a "fluid

---

**1.** The matching boxes found in the truck bore the name of a retailer, "Sam's Club." Before the arrest, the agents had been told that some of the boxes taken from the J.B. Hunt load were originally destined for Sam's Club in Woburn, Massachusetts. In addition, the model numbers of the Magnavox products in the truck driven by the defendants matched those stolen from J.B. Hunt.

**2.** Again, the name "Sam's Club" was present on the boxes discovered in the warehouse.

concept" that turns on the particular facts in each case. *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Moreover, a determination as to probable cause depends upon the totality of the circumstances "as seen and weighed not by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

■ The defendants contend that the warrantless arrests stemmed solely from uncorroborated information provided by an unknown informant, and that the conduct of the defendants was wholly innocuous. I find this argument to be without merit, and conclude that the totality of the circumstances provided the FBI with probable cause to arrest the defendants.

The FBI did not rely solely upon the statements of the informant in deciding to make the arrests. While the informant provided information that indicated that illegal activity might be afoot, the FBI had prior knowledge of the recent and local theft of a truckload of Magnavox electronics, the same brand the informant was being asked to transport. The informant's statement that he had been shown paperwork bearing the name J.B. Hunt further linked the goods he had been asked to transport to the truckload of goods that had been stolen a month earlier.

In addition, the FBI confirmed the informant's account through independent surveillance. The totality-of-the-circumstances analysis "consistently recognize[s] the value of corroboration of details of an informant's tip by independent police work." *Gates,* 462 U.S. at 241, 103 S.Ct. at 2334. By conducting surveillance on February 14 and confirming that the defendants' appearance and activities matched the information provided by the informant,[3] the FBI sufficiently established the credibility of the informant, and could reasonably conclude that stolen Magnavox equipment was loaded into the truck while it was parked at the Johnson Avenue warehouse. Independent investigation thus significantly bolstered the information supplied by the informant.

■ The defendants' additional claim that their activity was wholly innocuous, and therefore could not give rise to a determination of probable cause, is also without merit. The Supreme Court in *Gates* specifically rejected such an argument, holding that even "innocent behavior frequently will provide the basis for a showing of probable cause." *Gates,* 462 U.S. at 243 n. 13, 103 S.Ct. at 2335 n. 13. The relevant inquiry in assessing whether probable cause exists is thus "not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attached to particular types of noncriminal acts." *Id.*

■ The degree of suspicion that attached to the defendants' acts in the present case was substantial, and is a crucial element in the determination of probable cause. As *Cortez* instructs, this Court must consider the relevant events as they would be seen by those "versed" in law enforcement. 449 U.S. at 418, 101 S.Ct. at 695. The defendants arranged for the goods to be shipped with a great deal of secrecy and stealth: the informant was not to see the warehouse where the goods were stored, nor was he to know the final destinations of the goods until the loaded truck was returned to him. Although it hardly requires a law enforcement officer to recognize that such arrangements do not fit within the standard course of business for either electronics wholesalers or shipping companies, the clandestine maneuvering in this case gave rise to an especially strong and reasonable suspicion that illegal activity was taking place. Special Agent George Wright of the FBI's truck hijack squad testified that in every one of the twelve cases he has handled involving confidential informants and the sale of stolen property, the sellers refused to allow the confidential informant to learn the location of the warehouse in which the stolen goods were kept. Thus, the method of operation described by the informant, viewed by those well-versed in the field of

---

**3.** As the informant had predicted, the defendants were of Arab descent, took the keys to the truck from the informant, did not allow the informant to accompany them to the warehouse, drove the truck to a storage location, and appeared to be in the process of returning the truck to the informant when they were arrested.

law enforcement, added significantly to the mix of information on which the decision to arrest was based. I find that, under the totality of the circumstances, the FBI possessed probable cause to arrest the defendants.

### 2. The Search of the Truck

The search of the defendant's truck was conducted without a warrant. The government contends that two exceptions to the warrant requirement are applicable. First, it argues that the search of the truck was a "protective sweep" necessary to ensure the safety of the arresting agents. Second, it contends that the automobile exception to the warrant requirement applies. While I reject the first of these arguments, the automobile exception is properly invoked, and the motion to suppress the evidence discovered in the search of the truck is denied.

In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court held that law enforcement authorities may conduct a limited "sweep" as an incident to the arrest of a suspect in his home. *Id.* at 334, 110 S.Ct. at 1098. Such a sweep is justified in order to be sure that no one in the home of the arrested person poses an imminent threat to the lives of those making the arrest. *Id.* at 335, 110 S.Ct. at 1099. However, absent probable cause or reasonable suspicion, such a cursory sweep or search is only permissible to the extent that it is conducted in areas "immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. at 1098. Beyond this, there must be articulable facts and rational inferences suggesting that the area swept "harbors an individual posing danger to those on the arrest scene." *Id.* at 334–35, 110 S.Ct. at 1098–99.

In the present case, the government argues that the FBI's search of the defendants' truck was a valid protective sweep, and that the evidence uncovered in the search of the truck should therefore be admissible at trial. Specifically, the government argues that since the area searched (the back of the truck) was immediately adjacent to the arrest site (the cab of the truck), the search was justified in order to protect the arresting agents.[4]

The government's argument stretches *Maryland v. Buie* too far. The *Buie* Court noted at the outset that it was addressing "what level of justification is required ... before police officers, while conducting the arrest of a suspect *in his home* pursuant to a warrant, may conduct a warrantless protective sweep of all or part of the premises." 494 U.S. at 327, 110 S.Ct. at 1094 (emphasis added). The Supreme Court expressly differentiated an in-home arrest from that occurring elsewhere, stating that "unlike an encounter on the street or along the highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.'" *Id.* at 325, 110 S.Ct. at 1098. While a handful of courts have extended the "protective sweep" doctrine (albeit narrowly) to include motor vehicles,[5] this Court is not aware of any Second Circuit cases that so extend the doctrine, and the government has not brought such a case to the Court's attention. I conclude that the protective sweep exception does not apply to this search.

There is merit, however, to the government's argument regarding the automobile exception, and I find that this exception renders the evidence discovered in the defendants' truck admissible at trial. When law enforcement agents have probable cause to believe that a vehicle contains goods sub-

---

4. The government does not suggest that there was any particularized indication that persons were present in the back of the truck, which could amount to reasonable suspicion. Rather, it states that the FBI surveillance team "could not be sure whether the defendants were the only persons riding in the truck at the time of the stop and arrest." From the truck's cab, where the two defendants were arrested, it was not possible to see into the back of the truck, where the evidence was seized.

5. *See, e.g., United States v. Wiga*, 662 F.2d 1325 (9th Cir.1981) (motor home may be subject to protective sweep); *United States v. Lomeli*, No. 94 CR 173–1, 1995 WL 248039 (N.D.Ill. Apr. 26, 1995) (brief search of car seized by Drug Enforcement Agency was protective sweep rather than inventory search).

ject to seizure, the search of the vehicle and seizure of goods discovered is valid even absent a warrant. *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1925); *see also Michigan v. Thomas,* 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982). Moreover, provided law enforcement officials have probable cause to believe a vehicle contains contraband, a warrantless search is valid when limited to every part of the vehicle in which the object of the search could reasonably be concealed. *United States v. Ross,* 456 U.S. 798, 821 & n. 28, 102 S.Ct. 2157, 2171 & n. 28, 72 L.Ed.2d 572 (1982).

■ The factors that led to my determination that the FBI had probable cause to arrest the defendants also lead to the conclusion that the FBI possessed probable cause to believe the vehicle contained stolen property. The automobile exception is thus applicable here, and the fact that the FBI opened the side door of the truck and conducted a warrantless search of an area large enough to conceal the electronics in question did not violate the defendants' constitutional rights. The defendants' motion to suppress the evidence discovered in the truck is therefore denied.

## B. The Motion to Suppress Evidence From the Search of the Warehouse

Following the arrest of the defendants and the search of the truck, the FBI agents traveled six blocks back to the warehouse at 505 Johnson Avenue and conducted a warrantless search of the premises, uncovering still more stolen electronics. Hamdan challenges the constitutionality of this search, and seeks to suppress the evidence it uncovered. The government does not contend that any exceptions to the warrant requirement apply to the search of the warehouse, and it is plain to the Court that a warrant should have—and could have—been obtained. Nonetheless, the government argues that Hamdan lacks standing to challenge the constitutionality of the search. Hamdan asserts that he possesses such standing.

### 1. *The Law on Standing*

■ As the Supreme Court has stated, the determination as to whether an individual has standing to challenge a warrantless search does not depend strictly upon the ownership of the premises searched, but upon whether the individual had a reasonable expectation to privacy in the area searched. *Mancusi v. DeForte,* 392 U.S. 364, 366, 88 S.Ct. 2120, 2122, 20 L.Ed.2d 1154 (1968). The Second Circuit has further explicated this rule in *United States v. Chuang,* 897 F.2d 646 (2d Cir.1990), which directs a court considering standing to focus on two distinct elements. First, in order to claim standing, a party must have had a subjective expectation of privacy in the searched place; second, that party's expectation must be one that society accepts as reasonable. *Id.* at 649. Moreover, since Hamdan's argument is based in part on his claimed position in the HRK Wholesale Corporation ("HRK")—the lessee of the warehouse—I must also consider the law of standing as it relates to the search of a business area. As stated in *Chuang,* "it is well-settled that a corporate officer or employee in certain circumstances . . . may have standing with respect to searches of corporate premises." *Id.*

■ Whether a corporate officer has standing to challenge the search of business premises depends upon whether the officer has made a "sufficient showing of a possessory or proprietary interest in the area searched," and whether the officer has demonstrated a sufficient nexus between the area searched and his own work place. *Id.* Generally, courts tend to find that these two elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. *See, e.g., United States v. Taketa,* 923 F.2d 665 (9th Cir.1991) (corporate vice president had standing to challenge search of his office). However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched. The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found. *See, e.g., United States v. Britt,* 508 F.2d 1052 (5th Cir.1975)

(corporate president has standing to challenge search of corporate records in his office but not corporate records in storage area). By contrast, the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found. *See, e.g., Martinez v. Nygaard,* 831 F.2d 822 (9th Cir.1987) (factory workers could not challenge search of common area used by 75 people).

▉ Finally, in support of a motion to suppress evidence found in a warrantless search, the burden is on the defendant to show that he had a reasonable expectation of privacy in the place searched. *United States v. Perea,* 986 F.2d 633, 639 (2d Cir.1993); *see also Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556–2561, 65 L.Ed.2d 633 (1980). Therefore, in order to determine if Hamdan has sufficiently established his "possessory or proprietary interest" in the warehouse and a nexus between the searched area and his workplace, I will review the assertions of the parties.

Hamdan elected not to testify during the suppression hearing held by this Court. Instead, he has submitted affidavits in which he asserts that he controlled the warehouse and was an officer in the corporation that rented the warehouse. The government has countered with witnesses whose testimony contradicts Hamdan's assertions in several respects. The conflicting versions of events are described below.

### 2. *The Affidavits of Defendant Hamdan*

▉ In support of his claim that he has standing to challenge the search of the warehouse, Hamdan has submitted two affidavits. The first claims that Hamdan is the corporate secretary of HRK and is "responsible" for the warehouse. The affidavit also includes documentation regarding the first meeting of the HRK Board of Directors, in which Hamdan is listed as secretary and his mother Rebhiah Hamdan is listed as president.[6] In addition, the first affidavit includes a commercial lease between HRK and the owners of the warehouse, Abraham Belsky and Henry Bodner. The lease is signed only by Belsky and Rebhiah Hamdan, and nowhere does it include the signature of Jamil Hamdan.[7]

This first affidavit demonstrates neither a sufficient possessory (or proprietary) interest in the area searched, nor the required nexus between the area searched and Hamdan's workplace. Even assuming every fact stated in the affidavit to be true, the simple fact that Hamdan is the secretary of the corporation does not give him a proprietary interest. Moreover, the conclusory statement that Hamdan is "responsible" for the warehouse, absent further evidence to that effect, falls well short of meeting the *Chuang* requirements.

A supplementary affidavit submitted by Hamdan includes broader assertions of a proprietary interest in the warehouse. In his second affidavit Hamdan claims that he is the "sole operator" of the warehouse, that he is "solely responsible" for the warehouse's upkeep and security, that access to the warehouse is obtained only through him, and that the warehouse is Hamdan's personal "depot" in which he stores the corporation's merchandise. On their face, such assertions make a stronger case for Hamdan's standing to challenge the government search.

### 3. *The Testimony of The Government Witnesses*

The government produced three witnesses in the suppression hearing. Charles Micallef, a real estate manager, testified that from January 1994 to mid-March 1995, he leased a warehouse at 301 Fourth Avenue in Brooklyn to a heavyset man in his mid- to late-fifties named Ali Kassad. In early 1995, after Kassad stopped paying the rent, eviction proceedings were commenced. Micallef showed the warehouse to other prospective lessees

---

**6.** HRK was created in December 1994, and consisted of only two corporate officers. Although, as discussed below, Hamdan's stepfather apparently held the strongest interest in the corporation and its management, he is notably absent from its Board of Directors and is not an officer.

**7.** In his first affidavit, Hamdan stated that he was a signatory to the lease with Belsky. This assertion was subsequently dropped.

during the pendency of the proceedings. On one such occasion, he observed Magnavox electronics equipment in the warehouse.[8] Kassad promptly told him to leave the premises.

Micallef stated that he sometimes dealt with a man named Jimmy, whom the other evidence has revealed to be the defendant Jamil Hamdan, and whom Micallef identified as Ali Kassad's stepson. Specifically, Micallef would speak to Jimmy about repairs to the premises and other such matters. Micallef testified, however, that Kassad was in charge of the property and made all the important decisions regarding it.

Abraham Belsky, the owner of the warehouse at 505 Johnson Avenue, testified that he leased those premises in January 1995 for $2,000 per month to a heavyset man in his mid-fifties who fits the description of Kassad, but who identified himself to Belsky as "Mr. Hamdan." Belsky stated that this person signed the lease, paid the $4,000 security deposit, and was given the keys. Belsky did not recognize either of the defendants in this case as the man with whom he had executed the lease, and there is no dispute that this latter individual is Ali Kassad. However, Belsky testified that he spoke by phone with a man named "Jimmy" on two occasions— once when Belsky called to try to collect late rent payments, and once when Jimmy called to tell Belsky that Jimmy had "problems" and would be vacating the premises.

The final government witness was Imad Elhag, an employee who was hired by Ali Kassad to work at both warehouses—301 Fourth Avenue and 505 Johnson Avenue. Elhag was hired to carry boxes at the warehouses and to clean the premises. In January 1995, Kassad gave Elhag a key to the newly-leased Johnson Avenue warehouse and instructed him to begin working there. Kassad said that he would be sending Elhag trucks—Jimmy would be driving them—and Elhag would help load "stuff" inside the trucks brought by Jimmy. Shortly thereafter, various goods, including electronics equipment, were delivered to the Johnson Avenue warehouse.

Kassad instructed Elhag that he would be in charge of the Johnson Avenue warehouse, and that if the landlord or anyone else asked about the owner of the place, Elhag must not provide the real name.

 Elhag testified that Jimmy (the defendant Jamil Hamdan) came to the Johnson Avenue warehouse almost every day in order to either load or unload goods, with Elhag often assisting in the task. Elhag also stated that Hamdan would sometimes tell him to go from the warehouse at Johnson Avenue to the warehouse on Fourth Avenue, or vice versa, and that Elhag complied with these requests. Also, at the direction of Kassad, Hamdan hired several workers to clean up the warehouse after a flood and to fix the warehouse's alarm system. However, Elhag was hired by Ali Kassad, worked directly for Kassad, answered to Kassad, and was paid— in cash—by Kassad.

Elhag testified that goods were sometimes moved around within the 8,000 square foot warehouse. While the defendant Jamil Hamdan stored electronic goods in a dark area in the rear of the premises, there were no clearly partitioned storage areas nor any differentiation in the warehouse's floor space other than its proximity to the door. The defendant did not have a particular portion of the warehouse that was his. To the contrary, Elhag testified that "the whole thing belonged to Ali, to Mr. Kassad."

Although there was a small office at the front of the warehouse, there was no phone, desk, file cabinet, papers, or any other personal effects. Kassad, Jimmy and Elhag all had keys and general access to the warehouse.

### 4. Conclusion

A significant gulf exists between the facts in the defendant Jamil Hamdan's affidavits and those presented by the government witnesses. Hamdan presents himself as in absolute control of the warehouse, its operation, security and access. However, the testimony of the government witnesses creates a pic-

---

**8.** The government apparently contends that this merchandise was subsequently moved to the warehouse at 505 Johnson Avenue, where it was seized on February 14, 1995.

ture of Hamdan as clearly secondary to his stepfather Kassad, with far less responsibility than Kassad for the acquisition and control of the warehouse.

I credit the testimony of the government witnesses. Ali Kassad was the person who arranged the lease of the Johnson Avenue warehouse and directed its operations. While the defendant partially managed some of the day-to-day affairs of the warehouse, there was no portion of it that he possessed or ran. The defendant shared responsibilities with Elhag, shared access with Elhag, and (as compared to Kassad) held a decidedly secondary role in the overall management of the warehouse. In short, I find the statements in Hamdan's affidavit that he was the "sole operator," was "solely responsible" and had sole access to the warehouse to be false, as is the statement that Hamdan was "responsible" for the "merchandise" stored there.

In challenging a search of corporate premises, a defendant must, at a minimum, have had a possessory or proprietary interest in the area searched. *Chuang*, 897 F.2d at 649. The facts of this case demonstrate that Jamil Hamdan did not have a possessory or proprietary interest in the Johnson Avenue warehouse, and therefore lacks standing to challenge the warrantless search. As a result, the motion to suppress the evidence seized from the warehouse is denied.

So Ordered.