UNITED STATES of America,

v.

Albert TRANQUILLO, III, a/k/a "Allie Boy," Defendant.

No. S2 08 Cr. 236 (SCR).

United States District Court, S.D. New York.

March 4, 2009.

Arlo Devlin-Brown, New York, NY, for Plaintiff.

Barry Levin, Barry Levin, Esq., Garden City, NY, Richard Milton Asche, Litman, Asche Lupkin, Gioiella & Bassin, LLP, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

STEPHEN C. ROBINSON, District Judge.

Albert Tranquillo III, a/k/a "Allie Boy," has been charged in a Superseding Indictment with mail fraud, in violation of 18 U.S.C. § 1341, conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349, and bribery, in violation of 18 U.S.C. §§ 2, 666(a)(2). Mr. Tranquillo is alleged to have engaged in a scheme to defraud the City of Mount Vernon ("Mount Vernon") by overbilling it pursuant to carting contracts in effect between A & D Carting and Trancamp, two entities with which the Government alleges that Mr. Tranquillo was involved, and Mount Vernon. In connection with this investigation, a magistrate judge issued a warrant on March 19, 2008, authorizing the search of two desktop computers owned by A & D Carting and Trancamp.

Mr. Tranquillo has filed motions requesting a hearing under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), suppression of evidence obtained pursuant to the March 19 search warrant, dismissal of the Superseding Indictment for Government misconduct, a bill of particulars, and various forms of discovery. On January 22, 2009, after reviewing the parties' briefs, the Court *sua sponte* requested that the parties submit simultaneous, supplemental memoranda on the issue of Mr. Tranquillo's standing under the Fourth Amendment to challenge the legality of the search of A & D Carting and Trancamp's computers.

For the reasons set forth in this opinion, Mr. Tranquillo's motions are denied.

# I

## BACKGROUND

### A. The Investigation

This case arises out of a four-year investigation conducted by the Federal Bureau of Investigation ("FBI") concerning corruption within Mount Vernon.

Mr. Tranquillo[1] and his now deceased father, Albert Tranquillo, Jr., operated two related carting companies known as A & D Carting and Trancamp, with the former focusing on waste removal and the latter on demolition. Although ostensibly separate entities, the two businesses operated out of the same headquarters and shared personnel, equipment, money, and other resources. According to the Government, Mr. Tranquillo was the record owner of at least one Trancamp entity. Indeed, the Government claims that Mr. Tranquillo was listed on various contemporaneous documents as the manager and president of A & D Carting. Mr. Tranquillo's father also was the record owner of A & D Carting at times, but A & D Carting also submitted applications stating that Mr. Tranquillo's mother was the owner. The evidence at trial, the Government claims, will establish, through the testimony of former employees of both A & D Carting and Trancamp, that Mr. Tranquillo and his father operated the companies together, with Mr. Tranquillo's father having final authority but with Mr. Tranquillo nonetheless having substantial responsibility.

In November 2001, A & D Carting won a contract to remove both tree waste and concrete waste from the Mount Vernon waste removal facility (the "waste facility"). Typically, Mount Vernon employees brought the waste to the waste facility until it was collected and removed by private contractors. Pursuant to the 2001 contract, A & D Carting was to be paid $397 per 30 cubic yard container of tree and concrete waste. A Mount Vernon employee named Richard Sharpe was supposed to certify the amount of waste removed from the waste facility by initialing a "ticket" for each 30 cubic yard container of waste removed and then providing that initialed ticket to the A & D Carting driver. The driver, in turn, would provide the initialed ticket to A & D Carting employees, including, among others, Michael Pizzolongo, Mr. Tranquillo's alleged co-conspirator, and the ticket then would be mailed to Mount Vernon together with an invoice seeking payment.

According to the Government, however, the evidence at trial will establish that A & D Carting did not legitimately perform the work under the 2001 contract. Instead, Mr. Tranquillo and James Castaldo, Supervisor of Mount Vernon's Department of Public Works, arranged for Sharpe to initial as many tickets as presented in return for bribe payments made to Castaldo, who shared a portion of the bribes with Sharpe. The Government claims that both Mr. Tranquillo and his father delivered bribe payments to Castaldo by leaving money at a Mount Vernon business, the owner of which the Government anticipates will testify at trial. From time to time, Mr. Tranquillo also personally delivered payments to Sharpe.

According to the Government, this scheme operated successfully and resulted in Mount Vernon paying for much more waste than that which was actually removed. In 2002, the first full year of the contract between A & D Carting and Mount Vernon, Mount Vernon paid A & D

---

1. In March 2006, Mr. Tranquillo was arrested in connection with racketeering charges, *see United States v. Liborio Bellomo et al.,* 06–cr– 08 (LAK), which alleged that Mr. Tranquillo was an associate in the Genovese organized crime family of La Cosa Nostra.

Carting approximately $385,000 for waste removal, approximately four times what Mount Vernon had paid the previous year. This figure increased each year that the contract with A & D Carting was in effect, peaking at $856,000 in 2005. In 2007, the first full year in which the waste removal services were performed without overbilling by Mr. Tranquillo, Mount Vernon's costs decreased to less than $250,000. The Government estimates (conservatively, in its view) that the scheme illegally extracted from Mount Vernon $1.25 million.

Mr. Tranquillo's role in the operation included directing employees of A & D Carting and Trancamp to prepare the fraudulent tickets, occasionally taking those tickets to Sharpe, and delivering bribe payments to Castaldo. The Government expects that several former A & D employees will testify to Mr. Tranquillo's personal involvement in this scheme.

Mr. Tranquillo continued with the scheme even after A & D Carting's application to haul waste in Westchester County was rejected by the Westchester County Solid Waste Commission (the "Commission"), in part due to the company's past illegal dumping. The Commission ordered A & D Carting to halt its operations or sell the company to someone who could be licensed properly. Thereafter, A & D Carting's assets were sold to United Waste Services ("United Waste"), a company owned by John Curreri. Despite this sale, Mr. Tranquillo and his father continued to service the Mount Vernon waste facility, using Trancamp, the company with which Mr. Tranquillo was associated. In mid–2005, the Mount Vernon contract came up for renewal and Mr. Tranquillo and his father, neither of whom could haul waste legally in Westchester, arranged with Curreri for United Waste to bid on the contract. United Waste won. Mr. Tranquillo and his father, however, continued to service the Mount Vernon contract through Trancamp.

After United Waste won the Mount Vernon contract, Mount Vernon began presenting checks to United Waste. On January 25, 2006, Curreri received a check for $90,119 from Mount Vernon payable to United Waste. Mr. Tranquillo showed up at United Waste's offices and insisted that Curreri accompany him to a check-cashing facility in New Jersey to sign forms stating that Mr. Tranquillo worked for United Waste. These forms would allow Mr. Tranquillo to cash United Waste checks in the future. The Government alleges that Curreri then endorsed the $90,119 check, giving to Mr. Tranquillo 90% of the proceedings. Subsequently and on several occasions, Mr. Tranquillo and his father cashed at this New Jersey check-cashing facility checks from Mount Vernon made payable to United Waste.

## B. The Search Warrant

In connection with this investigation, FBI Special Agent Armando Palmieri submitted an affidavit in support of an application for a search warrant. The target premises was the law office of Stephen Schwartz in Yonkers, New York, and, the items to be seized were two Dell desktop computers. The affidavit states that these computers did not belong to attorney Schwartz but were brought to his law office in order to make certain documents on those computers available in response to a grand jury subpoena served on A & D Carting and Trancamp Contracting. The target computers, according to the affidavit, were owned by A & D Carting and Trancamp.[2] Attorney Schwartz, the affi-

---

**2.** For ease of reference, the Court shall refer to these two computers as owned by A & D
Carting.

davit recounts, stated that he would turn over the computers to the FBI in response to a search warrant.

As to probable cause for believing that these computers contained evidence of a crime, the affidavit first provides a summary of the fraudulent billing scheme. The affidavit describes the waste removal contract between Mount Vernon and A & D Carting/Trancamp as well as the use of fraudulent tickets issued by Sharpe in exchange for bribes.

More specifically, the affidavit stated that a confidential informant ("CI"), who had previously provided reliable and accurate information and who was employed by A & D Carting, told the government agents that tickets in excess of the waste that actually was removed by A & D Carting were provided by a Mount Vernon waste facility employee to A & D. The affidavit also explains that Sharpe, who was interviewed on several occasions, acknowledged that, in exchange for bribes, he issued extra tickets to truck drivers from A & D Carting/Trancamp, as well as to Mr. Tranquillo,

The affidavit describes that in 2005 the FBI installed a closed-circuit television camera ("pole camera") outside the waste facility. Using the video footage obtained from this camera, the affidavit explains, as well as documentation of the number of tickets issued for a particular day, the FBI was able to determine that the tickets for that day overstated by twenty-four the amount of 30–yard containers actually removed by A & D Carting. Billing records prepared by A & D Carting for December 7, 2005, show that Sharpe initialed sixteen tickets for the removal of sixteen 30 cubic yard containers filled with tree stumps and eleven tickets for the removal of eleven 30 cubic yard containers filled with concrete. Video footage obtained through the pole camera, however, revealed that only one Trancamp truck and no A & D Carting

trucks entered or left the waste facility on December 7. Based on the amount of tickets initialed by Sharpe, the affidavit explains, approximately nine to ten 100–yard trailer trucks (each of which can hold about three 30 cubic yard containers) would have been required to complete the job for which A & D Carting had billed Mount Vernon.

According to the affidavit, documentary evidence also indicated that in 2005 A & D Carting billed Mount Vernon for the removal of approximately 24,360 cubic yards of tree waste. Records from the waste facility, however, reflect that only 3,270 cubic yards of waste were actually removed.

Finally, the affidavit sets forth the basis for believing that evidence of this fraudulent billing scheme would be found on the two Dell computers owned by A & D Carting. On February 13, 2008, a subpoena on behalf of a federal grand jury was issued to A & D Carting and Trancamp, and it called for both paper and electronic records relating to the involvement of these companies in contracts with Mount Vernon. Attorney Schwartz, who represented the companies, made available the two Dell computers to FBI agents because, he indicated, they belonged to A & D Carting and could contain electronic documents responsive to the subpoena. Prior to submitting the warrant affidavit, Special Agent Palmieri accessed one of the computers and found numerous responsive documents, including invoices sent to Mount Vernon and accounting records relating to money received from Mount Vernon.

Mr. Tranquillo believes that the affidavit contains two material falsehoods. The first is the affidavit's statement that "Albert Tranquillo ..., and his now deceased father ... owned and operated A & D Carting until in or about September 2003." Memorandum of Law in Support of the

Pretrial Motions of Albert T. Tranquillo III ("Def.'s Mem."), Exh. A ¶ 5(a). The second purported material falsehood is the affidavit's failure to disclose that A & D Carting had used numerous dumpsites that were not investigated by the FBI, a fact that, according to Mr. Tranquillo, would have shown that A & D Carting dumped far more waste than represented by the warrant affidavit. *See id.* ¶ 10–11.

## II

## DISCUSSION

### A. Motion to Suppress

Mr. Tranquillo has filed a motion requesting that this Court hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and that the Court suppress the evidence obtained from the search of A & D Carting's computers. The Court begins with an analysis of whether Mr. Tranquillo has standing to request a *Franks* hearing and to contest the legality of the search of these computers.

### 1. Mr. Tranquillo's Expectation of Privacy in the Seized Computers

In arguing that a *Franks* hearing is necessary because materially false statements were included in the warrant affidavit, Mr. Tranquillo makes representations that raise substantial doubt as to his standing under the Fourth Amendment to contest the legality of the search of the two computers owned by A & D Carting. *See United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir.2008) ("Determining that a defendant has Fourth Amendment standing is a prerequisite to granting a motion for a *Franks* hearing."). Mr. Tranquillo contends that the warrant affidavit contains two allegations that are intentionally misleading and false. Specifically, Mr. Tranquillo argues that, contrary to allegations in the warrant affidavit, he "was never an owner, manager, or supervisor of A

& D Carting." Def.'s Mem. at 9. He also maintains that Special Agent Palmieri interviewed numerous A & D Carting employees who "unequivocally" informed Palmieri that Mr. Tranquillo "was merely a driver for A & D Carting and had no role in the billing of Mt. Vernon or any other account." *Id.*

After setting forth the applicable constitutional principles, the Court shall turn to Mr. Tranquillo's standing arguments.

#### a.

"Fourth Amendment rights," the Supreme Court of the United States has explained, "are personal rights ... [that] may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Although this concept of personal rights typically is referred to as "standing," which implies a separate analysis, *see id.* at 139, 99 S.Ct. 421, the issue of personal rights is "invariably intertwined" with the merits of the Fourth Amendment inquiry. *Id.* at 139–40, 99 S.Ct. 421; *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir.1990) ("[W]e are mindful that the Supreme Court has dispensed with the notion of standing as being theoretically distinct from the substantive merits of a Fourth Amendment claim."). Ultimately, the Fourth Amendment inquiry hinges on whether the area or thing "searched was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte*, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *see also Rakas*, 439 U.S. at 140, 99 S.Ct. 421 (describing the inquiry as whether "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect"). "This threshold question," the Court of Appeals for the Second Circuit has noted, "involves two separate inquiries: first, [the defendant] must demonstrate a subjective

expectation of privacy in a searched place or item; and second, his expectation must be one that society accepts as reasonable." *Chuang*, 897 F.2d at 649.

Several cases have elucidated how these principles operate when the premises or items searched belong to corporate entities. In this context, whether a corporate officer or employee "has a reasonable expectation of privacy to challenge the search of business premises focuses principally on whether he has made a sufficient showing of a *possessory or proprietary interest* in the area searched." *Id.* (emphasis supplied). The corporate employee, moreover, "must demonstrate a sufficient 'nexus between the area searched and [his] own work space.'" *Id.* (quoting *United States v. Britt*, 508 F.2d 1052, 1056 (5th Cir.1975)); *see also* WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 9.1(c), at 503 (4th ed. 2004) ("Consistent with *Mancusi*, courts have held that a corporate or individual defendant in possession of the business premises searched has standing, and that an officer or employee of the business enterprise has standing if there was a demonstrated nexus between the area searched and the work space of the defendant."). Although these elements necessarily must be determined on a case-by-case basis, there are several considerations that provide guidance:

> Generally, courts tend to find that these elements are sufficiently established when the area searched is set aside for the defendant's exclusive use, such as an individual office. However, courts are more skeptical of standing claims when the defendant only occasionally used the area searched. The greater the degree of exclusivity and control over a work area, and the more time a defendant spends there, the more likely standing is to be found. By contrast, the less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found.

*United States v. Hamdan*, 891 F.Supp. 88, 94–95 (E.D.N.Y.1995) (citations omitted).

Finally, the defendant bears the burden of setting forth facts sufficient to establish that his personal rights were violated by the search. *Rakas*, 439 U.S. at 131 n. 1, 99 S.Ct. 421 ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). With these principles in mind, the Court turns to whether Mr. Tranquillo has satisfied this burden.

**b.**

■ Following the Court's request for supplemental memoranda on this issue, Mr. Tranquillo contends that his personal rights were violated by the search of the two computers owned by A & D Carting because he was "an occasional occupant at the A & D Carting offices as a long-term employee of the company." Defendant's Supplemental Memorandum ("Def.'s Suppl. Mem.") at 2. As such, Mr. Tranquillo notes, he had a key to enter and exit the business premises.[3]

There are several hurdles, both procedural and substantive, that Mr. Tranquil-

---

**3.** Mr. Tranquillo also contends that the Government waived this issue by failing to raise it in its opposition to his motions. Unlike Article III standing, which is not subject to waiver, standing under the Fourth Amendment is not jurisdictional and thus may be waived. *See United States v. Olivares–Rangel*, 458 F.3d 1104, 1106 n. 1 (10th Cir.2006). This Court, however, raised the standing issue *sua sponte*, the issue has been briefed fully by both parties, and the Court therefore shall address the issue on its merits. *See, e.g., United States v. Matthews*, 615 F.2d 1279, 1282 (10th Cir. 1980) (noting that the district court raised the issue of Fourth Amendment standing *sua sponte* and addressed the matter on the merits).

lo's arguments face. As a preliminary matter, Mr. Tranquillo has not put forth the foregoing facts—or, indeed, *any* facts relevant and probative of his privacy interest in the two A & D Carting computers—in a sworn affidavit. *See United States v. Sorcher*, No. 05 Cr. 799, 2007 WL 1160099, at *8 (S.D.N.Y. Apr. 18, 2007) ("Indeed, the record contains no affidavits from defendants asserting their possessory or proprietary interest in the documents."); *cf. United States v. Dinero Express, Inc.*, No. 99 Cr. 975, 2000 WL 254012, at *5–6 (S.D.N.Y. Mar. 6, 2000) (affidavits submitted to support the claim of standing); *Hamdan*, 891 F.Supp. at 94–95 (same); *United States v. Chuang*, 696 F.Supp. 910, 911–12 (S.D.N.Y.1988) (same), *aff'd*, *Chuang*, 897 F.2d at 652.

Even had he put the foregoing facts in admissible form, however, they nonetheless would be insufficient to establish that Mr. Tranquillo's personal rights were violated by the search of the two A & D Carting computers. Although Mr. Tranquillo alleges that he was "an occasional occupant" of the A & D Carting offices and had key access to the business premises, *see* Def.'s Suppl. Mem. at 2, these facts are relevant only if the two seized computers were kept in A & D Carting's offices and if Mr. Tranquillo regularly occupied or worked in the particular room in which the computers were kept. The record evidence, however, contains no indication whatsoever as to where the seized computers were kept. *See Chuang*, 897 F.2d at 649 (asking whether the defendant demonstrated a "a sufficient nexus *between the area searched and his own work space*") (internal quotation marks and citation omitted) (emphasis supplied). More important, the record evidence does not reveal whether Mr. Tranquillo regularly occupied or worked in the particular room in which the computers were kept. *See Dinero Express, Inc.*, 2000 WL 254012, at *5–6 (finding that the defendant lacked standing where, among other things, he only "occasionally" visited the premises searched); *Hamdan*, 891 F.Supp. at 94–95 ("[T]he less private a work area—and the less control a defendant has over that work area—the less likely standing is to be found.").

Notably, Mr. Tranquillo, in his request for a *Franks* hearing, claims that he "was never an owner, manager, or supervisor of A & D Carting," that he "merely" was "a driver for A & D Carting," and that he "had no role in the billing of Mt. Vernon or any other account." Def.'s Mem. at 9. Given such factual allegations, it is indeed implausible that Mr. Tranquillo had access to, or a privacy or proprietary interest in, A & D Carting's computers.[4] *See Chuang*, 897 F.2d at 649 (holding that a defendant "has a reasonable expectation of privacy to challenge the search of business premises . . . [if] he has made a sufficient showing of a possessory or proprietary interest in the area searched").

---

4. In its recitation of the facts for purposes of opposing Mr. Tranquillo's motion, the Government contends that Mr. Tranquillo, *at some unspecified point*, was the record owner of one of the Trancamp entities and that he was listed as the "manager" or "president" of A & D Carting. Mr. Tranquillo, however, has denied these allegations in his submissions in connection with his motion for a *Franks* hearing and for suppression of evidence. Even if Mr. Tranquillo had not denied the Government's allegation that, at some unspecified point, he was the record owner, manager, or president of the one of the Trancamp entities, those allegations standing alone would be insufficient to establish that, at the time that A & D Carting's computers were searched, he had a proprietary interest in them. (In addition, and as already noted, he has not submitted any affidavits detailing the factual basis for his purported privacy or proprietary interest in the computers owned by A & D Carting.)

Consequently, the Court concludes that Mr. Tranquillo has not carried his burden to establish that his personal Fourth Amendment rights were violated by the search of the two A & D Carting computers. *See Mastromatteo,* 538 F.3d at 544.

## 2. Motion for a *Franks* Hearing

■ In any event, even if Mr. Tranquillo had established a reasonable expectation of privacy in A & D Carting's computers, an analysis of the allegedly false statements contained in the warrant affidavit reveal that they were immaterial to the probable cause determination.

### a.

In *Franks,* the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." 438 U.S. 154, 155–56, 98 S.Ct. 2674 (1978). To merit an evidentiary hearing under *Franks,* the Court explained:

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistakes are insufficient.

*Id.* at 171, 98 S.Ct. 2674. Even if the warrant affidavit incorporates false statements, *Franks* requires a court to determine whether, after the false statement is excised from the affidavit, the remaining portions of the affidavit would suffice to establish probable cause to issue the warrant. *Id.* at 171–72, 98 S.Ct. 2674; *United States v. Trzaska,* 111 F.3d 1019, 1028–29 (2d Cir.1997).

■ Probable cause, the Supreme Court has observed, is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (explaining that probable cause does not require a "prima facie showing"). It exists if, "given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S.Ct. 2317; *see also United States v. Falso,* 544 F.3d 110, 117 (2d Cir.2008). Thus, although "probable cause requires more than a 'mere suspicion,' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties.'" *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (quoting *Mallory v. United States,* 354 U.S. 449, 455, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) and *Gates,* 462 U.S. at 231, 103 S.Ct. 2317). Whether the probabilities amount to probable cause must be assessed in light of "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Gates,* 462 U.S. at 231, 103 S.Ct. 2317).

### b.

Mr. Tranquillo believes that the warrant affidavit contains two material falsehoods. The first is the affidavit's statement that "Albert Tranquillo ..., and his now deceased father ... owned and operated A & D Carting until in or about September

2003." Def.'s Mem. Exh. A ¶ 5(a). One of the purported material falsehood is the affidavit's failure to disclose that A & D Carting had used numerous dumpsites that were not investigated by the FBI, and thus would have shown that A & D Carting dumped far more waste than represented by the search warrant affidavit. *See id.* ¶ 10–11. If these allegations are excised from the warrant affidavit, however, the remaining portions are sufficient to establish "a fair probability that contraband or evidence of a crime [would] be found" in the two A & D Carting computers. *Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

Regardless of who owned A & D Carting or Trancamp on paper, the affidavit establishes probable cause to believe that both companies were involved in a scheme to defraud Mount Vernon and that Mr. Tranquillo was an active and knowing participant in the scheme. For example, the affidavit explains that Richard Sharpe, an A & D Carting employee, acknowledged that he had issued extra tickets to truck drivers from A & D Carting/Trancamp, as well as to Mr. Tranquillo, in exchange for bribes. Sharpe's statements also were corroborated by a CI who was employed by A & D Carting and was familiar with its procedures for picking up waste from Mount Vernon. The CI explained that A & D Carting frequently obtained fraudulent tickets from a Mount Vernon waste facility employee in excess of the waste that was actually removed by A & D Carting. These allegations would have led a reasonable person to conclude that there was a fair probability of finding evidence in A & D Carting's corporate computers of a scheme to defraud Mount Vernon by overbilling it in connection with waste removal.

■ The second purported falsehood, equally immaterial, is that the affidavit failed to disclose that A & D Carting had used numerous dumpsites that were not investigated by the FBI. Had the use of these dumpsites been disclosed in the affidavit, Mr. Tranquillo claims, it would have shown that A & D Carting dumped far more waste than represented by the search warrant affidavit. Even had the affidavit disclosed the existence of these additional dumpsites, probable cause would have supported the issuance of the search warrant. The affidavit contains evidence showing A & D Carting was *picking up* less waste than that for which it was billing Mount Vernon—and, plainly, A & D Carting could not have dumped more waste at other dumpsites if it was not, in the first instance, picking up that waste from Mount Vernon's waste facility. For example, the affidavit explains that billing records prepared by A & D Carting for December 7, 2005, show that Sharpe initialed sixteen tickets for the removal of sixteen 30 cubic yard containers filled with tree stumps and eleven tickets for the removal of eleven 30 cubic yard containers filled with concrete. Video footage obtained through the pole camera that the FBI had installed surreptitiously outside of the waste facility revealed that only one Trancamp truck and no A & D Carting trucks entered or left the waste facility on December 7. Based on the amount of tickets initialed by Sharpe, the affidavit explains, approximately nine to ten 100–yard trailer trucks (each of which can hold about three 30 cubic yard containers) would have been required to complete the job for which A & D Carting had billed Mount Vernon.

Thus, when the allegedly false statements are excised from the warrant affidavit, the remaining portions are sufficient to establish "a fair probability that contraband or evidence of a crime [would] be found" in the two A & D Carting computers, *Gates,* 462 U.S. at 232, 103 S.Ct. 2317.

Consequently, Mr. Tranquillo's request for a *Franks* hearing is denied.

### B. Motion to Dismiss the Indictment for Government Misconduct

Mr. Tranquillo moves to dismiss the Superseding Indictment on the ground that the Government has engaged in misconduct by presenting false testimony to the grand jury. Mr. Tranquillo submits—apparently, solely based "upon information and belief"—that "knowingly false testimony was presented to the grand jury by government witnesses, including [Special Agent] Palmieri, to create culpability in the defendant where none existed." Def.'s Mem. at 12. The basis for this argument is the same purported falsities that Mr. Tranquillo alleges were contained in the warrant affidavit. These purported falsities allegedly presented to the grand jury include the statement that Mr. Tranquillo was an owner, manager, or supervisor of A & D Carting and the other Trancamp entities and the omission of the FBI's investigation of additional dumpsites used by A & D Carting over the relevant time period.

Mr. Tranquillo also takes specific aim at one of the allegations included in the Superseding Indictment, which states that on January 25, 2006, Mr. Tranquillo "cashed a $90,919 check from the City of Mount Vernon payable to United Waste." *See* Superseding Indictment ¶ 11.b. He contends that this check actually was endorsed by John Curreri not Mr. Tranquillo. Def.'s Mem. Exh. B at 1.

■■ It is axiomatic that "grand jury proceeding[s][are] accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. Mechanik,* 475 U.S. 66, 75, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). Also clear is the principle that "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Given this high standard and given Mr. Tranquillo's barebones accusation that the Government presented false testimony to "create culpability"—an accusation based solely on "information and belief"—this argument does not merit extended discussion.

■ With respect to Mr. Tranquillo's allegation that the Government falsely claimed to the grand jury that he was an owner, manager, supervisor of A & D Carting, the Government has indicated that it possesses corporate records listing him as manager and president of A & D Carting. The Government has further indicated that former employees of both A & D Carting and Trancamp will testify that Mr. Tranquillo and his father operated the companies together, with Mr. Tranquillo's father having final authority but with Mr. Tranquillo nonetheless having substantial responsibility. Mr. Tranquillo also contends that the Government failed to inform the grand jury that it (the Government) had investigated other dumpsites used by the Trancamp entities and that this information allegedly would have made less stark the difference between the amount that Mount Vernon was billed and the total waste that the Tranquillos removed. Even if Mr. Tranquillo had compelling—or, indeed, any—evidence that the Government was in possession of information concerning these additional dumpsites, his argument would face an intractable legal hurdle: "The Government ha[s] no obligation to present exculpatory material to a grand jury." *United States v. Regan,* 103 F.3d 1072, 1081 (2d Cir.1997) (quoting *United States v. Williams,* 504 U.S. 36, 51–52, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992)).

Mr. Tranquillo's final basis for dismissal is the Superseding Indictment's statement

that Mr. Tranquillo "cashed" the $90,919 check when, in fact, John Curreri endorsed that check. The Government contends, however, that the evidence at trial will show that Mr. Tranquillo went to Curreri's workplace and insisted that Curreri drive to a check-cashing facility in order to sign documents allowing Mr. Tranquillo to cash checks made out to Curreri's company. Although Curreri endorsed the $90,919 check, the Government contends that he gave to Mr. Tranquillo ninety percent of that money because it was payment for the removal of waste from Mount Vernon. The Government certainly could have used more precise language in crafting this allegation in the Superseding Indictment. Given the Government's representations of what it intends to prove at trial, however, its imprecise characterization of these events is not a ground for dismissing the Superseding Indictment. *See, e.g., United States v. Gambino,* 809 F.Supp. 1061, 1079–80 (S.D.N.Y.1992) ("[A] defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency.") (collecting cases). Consequently, Mr. Tranquillo's motion to dismiss the Superseding Indictment is denied.

### C. Motion for a Bill of Particulars

 An indictment may fulfill the requirements of Federal Rule of Criminal Procedure 7(c)(1) but nonetheless may provide insufficient information to permit the preparation of an adequate defense, *see United States v. Rigas,* 490 F.3d 208, 237 (2d Cir.2007); under such circumstances, the "court may direct the government to file a bill of particulars." FED. R. CRIM. P. 7(f). A bill of particulars, however, is not necessary unless additional facts are required to prepare an adequate defense, to avoid surprise and prejudice, or to interpose a double jeopardy defense in the future. *Rigas,* 490 F.3d at 237; *United States v. Torres,* 901 F.2d 205, 234 (2d

Cir.1990). Nor may a bill of particulars be used as a discovery tool. *Torres,* 901 F.2d at 234 ("Acquisition of evidentiary detail is not the function of the bill of particulars." (internal quotation marks and citations omitted)). Finally, no bill of particulars is required if the defendant obtains the necessary information in "some acceptable ... form," such as discovery. *United States v. Bortnovsky,* 820 F.2d 572, 572 (2d Cir. 1987) (per curiam).

Mr. Tranquillo requests that the Government provide him with "identification of the unindicted co-conspirators," the specific conduct in which he is alleged to have participated, and the name of persons present when any overt and substantive acts transpired. Def.'s Mem. at 26–28. The Government has provided to Mr. Tranquillo the necessary information and discovery to present a defense. The Government has provided to Mr. Tranquillo with the specific dates on which the two listed overt acts took place, has described those acts with particularity, and has turned over voluminous Rule 16 discovery. As a result of the Government's Superseding Indictment, its memorandum of law submitted in opposition to Mr. Tranquillo's motion, and the charges instituted against other members of the alleged conspiracy, Mr. Tranquillo also has been made aware that his co-conspirators include Michael Pizzolòngo, his deceased father, James Castaldo, and Richard Sharpe. This information, in the Court's view, satisfies the Government's obligation to provide sufficient information to allow for the preparation of an adequate defense, to avoid surprise and prejudice, and to interpose a double jeopardy defense. *See Rigas,* 490 F.3d at 237.

### D. Discovery Requests

Mr. Tranquillo's motion for early disclo-

sure of materials under *Giglio*,[5] the Jencks Act, 18 U.S.C. § 3500, and Rule 404(b) is denied. The Government has represented to the Court that it has complied, and will continue to comply, with its *Brady* obligations and that it will turn over *Giglio* and Jencks Act, 18 U.S.C. § 3500, materials in time for effective use. *See In re United States v. Coppa*, 267 F.3d 132, 147 (2d Cir.2001) ("We reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner."); *United States v. Trippe*, 171 F.Supp.2d 230, 237–38 (S.D.N.Y.2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify."). The Government has indicated that it will make the required disclosure two weeks prior to trial, a practice that typically comports with Rule 404(b). *See United States v. Fennell*, 496 F.Supp.2d 279, 284 (S.D.N.Y.2007).

■■■■■ Mr. Tranquillo's request for the identification of confidential informants also is denied. A defendant seeking such disclosures "must establish that, absent such disclosure, he will be deprived of his right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir.1997); *United States v. Tucker*, 380 F.2d 206, 212–13 (2d Cir.1967). Mere "[s]peculation that disclosure of the informant's identity will be of assistance," the Second Circuit has noted, "is not sufficient to meet the defendant's burden." *Fields*, 113 F.3d at 324 ("Instead, the district court must be satisfied, after balancing the competing interests of the government and the defense,

that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity."). Mr. Tranquillo has not shown, in any particularized way, a need for disclosure of the identities of confidential informants. The Government, in contrast, has indicated that it has concerns regarding the safety of any confidential informants should their names be provided to the defendant. These concerns are well founded given the Mr. Tranquillo's past involvement with the Genovese organized crime family and given his past violent conduct toward individuals who threatened Mr. Tranquillo's interests in the carting companies involved in these charges. *See supra* note 1; Government's Memorandum of Law in Opposition to Defendant's Pre–Trial Motions at 36–37. The Court therefore denies Mr. Tranquillo's request for the identification of confidential informants.

## Conclusion

For the foregoing reasons, the Court denies Mr. Tranquillo's pre-trial motions in their entirety.

The Clerk of the Court is directed to close docket entry number 14.

*It is so ordered.*

---

5. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).